1
2
3
4

James Kennedy, Esq. (pro hac vice forthcoming)
jkennedy@kennedyberg.com
KENNEDY BERG LLP
401 Broadway, Suite 1900
New York, New York 10013
Telephone: (212) 899-3400
Facsimile: (212) 899-3401

5
6
7
8
9

Jeffrey H. Reeves, Esq. (State Bar No. 156648)
jreeves@tocounsel.com
Bradley Dugan, Esq. (State Bar No. 271870)
bdugan@tocounsel.com
THEODORA ORINGHER PC
535 Anton Boulevard, Ninth Floor
Costa Mesa, California 92626-7109
Telephone: (714) 549-6200
Facsimile: (714) 549-6201

10
11

Attorneys for Intervenor
Sterling Financial & Realty Group, Inc.

12

## UNITED STATES DISTRICT COURT

13

### CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

14

| | |
|---|---|
| OCEAN THERMAL ENERGY CORPORATION, | Case No. 2:19-cv-05299-VAP-JPR |
| Plaintiff, | **NOTICE OF MOTION AND MOTION TO INTERVENE; MEMORANDUM OF POINTS AND AUTHORITIES** |
| vs. | |
| C. ROBERT COE III, BRETT M. REGAL, DAVID R. LARGE, MIGRATION PARTNERS, LLC, NAUTILUS PARTNERS, LLC and TRADE BASE SALES, INC., | The Hon. Virginia A. Phillips |
| | Hearing:<br>Date                    March, 9, 2020<br>Time:                   2:00 p.m.<br>Dept:                   8A |
| Defendants. | Date Action Filed:  June 18, 2019<br>Trial Date:            None Set |

15
16
17
18
19
20
21
22
23
24
25
26
27
28

**TO THE PARTIES AND THEIR COUNSEL OF RECORD:**

**PLEASE TAKE NOTICE** that on March 9, 2020 in Courtroom 8A of this Court, located at 350 West 1st Street, Los Angeles, California 90012, non-party Sterling Financial & Realty Group ("**Sterling**") will move this Court to intervene in this matter, as of right or permissibly, pursuant to Rule 24(a) and (b) of the Federal Rules of Civil Procedure.

The grounds for the motion are set forth in the accompanying Motion with Intervene with Memorandum of Points and Authorities, dated February 10, 2010.  A Proposed Complaint in Intervention ("**Proposed Complaint**") asserting Sterling's claims against the parties to this action is attached hereto.  The Proposed Complaint shows that Sterling "claims an interest relating to the property or transaction that is the subject of the action," that its "interest may be "impair[ed] or impede[d]" by disposition of the action and that the "existing parties [do not] adequately represent that interest." Fed. R. Civ. P. 24(a)(2) (intervention as of right). The Proposed Complaint also shows that Sterling has "a claim or defense that shares with the main action a common question of law or fact.**"** Fed. R. Civ. P. 24(b) (permissive intervention).

Sterling owns and/or has first priority perfected property rights in the property that is the subject matter of this action ("**Collateral**"), as established by a prior Consent Judgment entered by a Florida state court on May 6, 2019 ("**Florida Judgment**") and by prior Uniform Commercial Code ("**UCC**") Financing statements that were duly filed with the Secretary of State in California and Ohio ("**UCC Filings**"), where the Collateral is located.  The Florida Judgment and UCC Filings are attached as **<u>Exhibits 1, 4, and 5</u>** to the Proposed Complaint.

On July 3, 2019, this Court entered a Stipulated Order appointing a Receiver ("**Receivership Order**") and directing him, among other things, to take possession and control of the Collateral, to levy upon the same and distribute the sale proceeds

1  to plaintiff Ocean Thermal Energy Corp. ("**OTEC**"), a judgment creditor without

2  any ownership of or protected security in the Collateral, and to distribute the

3  remaining sale proceeds to defendants and the Receiver, without mention of

4  Sterling's superior property rights.  Dkt. No. 9.  A copy of the Receivership Order is

5  attached as **Exhibit 2** to the Proposed Complaint.

6        On January 22, 2019, this Court approved and entered a Stipulated Order

7  authorizing the Successor Receiver to sell a rare collection of gemstones ("**Ophir**

8  **Collection**"), which constitutes a significant part of the Collateral, pursuant to a

9  badly flawed contract of sale that contravenes Sterling's rights pursuant to the

10 Florida Judgment and the UCC Filings.  Dkt. No. 22.

11       To the extent that L.R. 7-3 applies to a non-party, Sterling has complied with

12 it. By email dated January 30, 2019, the Successor Receiver welcomed this motion,

13 stating that it would be "fine" if Sterling moves to intervene so long as Sterling

14 provides him with notice.  OTEC's counsel has been copied on these emails.

15 Furthermore, beginning in late December 2019, Sterling's New York litigation

16 counsel (who will be seeking admission *pro hac vice*) also engaged in what proved

17 to be an unproductive discussion with defendants' counsel about this matter.

18       WHEREFORE, Sterling, a non-party with a protectable interest in this action,

19 respectfully moves this Court for an order allowing its intervention in this matter.

20 This motion is based upon this Notice of Motion, the Motion with accompanying

21 Memorandum of Points and Authorities, the supporting Declaration of Jeff

22 Hackman, Sterling's President, the claims asserted in the Proposed Complaint and

23 the papers, records, and evidence on file in this action, as well as any other written

24 or oral evidence that may be presented at or before the time this motion is heard by

25 the Court. A proposed order has been filed herewith.

26

27

28

1   DATED:  February 10, 2020      THEODORA ORINGHER PC

2

3                                    By:/s/ Bradley Dugan

4                                         Bradley Dugan

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

*NOTICE OF MOTION AND MOTION TO INTERVENE*

# **TABLE OF CONTENTS**

**Page**

I.    INTRODUCTION AND MOTION ................................................................. 1

II.   STATEMENT OF FACTS .......................................................................... 4

    A.   Sterling's Early Dealings with the Regal Parties and OTEC's Counsel, Barks ......................................................................... 4

    B.   Sterling Purchases the Concentrate and Obtains Its Security Interest in the Collateral ................................................ 5

        1.   The Ophir Collection Consulting Agreement ............................. 5

        2.   The Concentrate Sale Agreement and Secured Promissory Note ................................................................ 6

        3.   The UCC Filings ............................................................. 6

    C.   OTEC Obtains the "Agreed Judgment" in Tennessee, but With no Security Interest ...................................................... 7

    D.   The Consent Final Judgment ................................................. 8

    E.   The Receivership Order ....................................................... 10

    F.   Sterling Notifies the Receiver of its Property Rights in the Collateral ............................................................... 11

    G.   The Order of Sale ............................................................... 12

III.  THE MOTION TO INTERVENE SHOULD BE GRANTED ....................... 13

    A.   Sterling Has a Right to Intervene ......................................... 14

        1.   Timeliness .................................................................... 15

        2.   Significantly Protectable Interest in the Subject Matter ............ 16

        3.   Sterling's Ability to Protect Its Interest May be Impaired ......... 17

        4.   The Parties do not Adequately Protect Sterling's Interest ......... 18

    B.   Sterling Should be Granted Permission to Intervene ................ 19

IV.   CONCLUSION .................................................................................... 20

# TABLE OF AUTHORITIES

**Page(s)**

## Federal Cases

*Beckman Indus., Inc. v Intl. Ins. Co.*,
   966 F2d 470 (9th Cir 1992) ............................................................... 16

*Cal. ex rel. Lockyer v. United States*,
   450 F.3d 436, 441 (9th Cir. 2006) ................................................... 17

*California Trout, Inc. v United States Bur. of Reclamation*,
   115 F Supp.3d 1102 (CD Cal. 2015) ............................................... 18

*CEP Emery Tech Inv'rs LLC v JPMorgan Chase Bank, N.A.*,
   09-04409 (SBA), 2010 WL 1460263 (N.D. Cal. 2010) ......................... 19, 20

*Citizens for Balanced Use v. Montana Wilderness Association*,
   647 F.3d 893 (9th Cir. 2011) ........................................................... 18

*Donnelly v. Glickman*, 159 F.3d 405, 409 (9th Cir. 1998) ........................... 15, 17

*Forest Conservation Council v. United States Forest Serv.*,
   66 F.3d 1489 (9th Cir. 1995) ........................................................... 15

*Idaho Farm Bureau Fed'n v. Babbitt*,
   58 F.3d 1392 (9th Cir. 1995) ........................................................... 16

*In re Peregrine Entertainment, Ltd.*,
   116 BR 194 (CD Cal 1990) ............................................................... 17

*S.E.C. v Credit Bancorp, Ltd.*,
   194 F.R.D. 457 (S.D.N.Y. 2000) ....................................................... 19

*Sapukotana v Van Straalen Farm Trucking*,
   457 Fed.App'x 682 (9th Cir. 2011) ................................................... 17

*Scotts Val. Band of Pomo Indians of Sugar Bowl Rancheria v United States*,
   921 F2d 924 (9th Cir. 1990) ............................................................. 16

*Smith v Los Angeles Unified School Dist.*,
   830 F.3d 843 (9th Cir 2016) ............................................................. 16

*Thompson v Thompson*,
   2-18-CV-04269 (RGK), 2018 WL 6133659 (CD Cal July 31, 2018) ........... 16

*Trbovich v. United Mine Workers of Am.*,
   404 U.S. 528 (1972) ....................................................................... 19

*United States v. Alisal Water Corp.*,
   370 F.3d 915 (9th Cir. 2004) ........................................................... 15

*Wilderness Soc'y v. United States Forest Serv.*,
   630 F.3d 1173 (9th Cir. 2011) ......................................................... 15

1

2

**<u>Rules</u>**

3

Fed. Rule Civ. Proc. 24 ............................................................... 15. 16, 19

4

5

**<u>Other Authorities</u>**

6

6 Edward J. Brunet, *Moore's Federal Practice* § 24.03[4][a] (3d ed. 1997)....... 19

7

U.S. Const. art. IV § 1 .................................................................. 14, 17

8

UCC § 9301(1)............................................................................ 17

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

*NOTICE OF MOTION AND MOTION TO INTERVENE*

## I.     INTRODUCTION AND MOTION

The parties have perpetuated a fraud on this Court.  The parties misled this Court into entering stipulated orders – one dated July 2, 2019 appointing a Receiver (Dkt. No. 9) ("**Receivership Order**") and another dated January 10, 2020 approving a contract to sell the collateral (Dkt. No. 22 ("**Order of Sale**") – that violate Intervenor's priority property rights in the same collateral.  Intervenor's rights are established by a prior Consent Judgment entered by a Florida state Court on May 6, 2019 ("**Florida Judgment**") and by earlier UCC Financing Statements filed on behalf of Intervenor with the Secretary of State in California and Ohio, where the collateral is located ("**UCC Filings**").

In their Joint Application seeking the appointment of a Receiver, the parties acknowledged only their "aware[ness] of a purported judgment creditor in Florida who may be seeking to levy on" the collateral and used that as a reason to appoint a Receiver.  The inference was that the Receiver would protect the parties from interference with their rights by a "purported" creditor having inferior property rights.  The parties knew not only that Intervenor has superior property rights, but also that the Florida Judgment forecloses the very relief they wrongfully sought (and obtained) from this Court.  Fortunately, this fraud can be remedied because the approved sale – on badly flawed terms that do not set definitive funding or closing dates – has not been funded, has not closed and likely never will.

Accordingly, Intervenor Sterling Financial and Realty Group, Inc. ("**Sterling**") hereby **moves to intervene** in this matter pursuant to Rule 24(a) and (b) of the Federal Rules of Civil Procedure.  As demonstrated by Sterling's Proposed Complaint in Intervention (attached to its Notice of Motion) ("**Compl.**"), Sterling "claims an interest relating to the property or transaction that is the subject of the action," its "interest may be "impair[ed] or impede[d]" by disposition of the action and the "existing parties [do not] adequately represent that interest." Fed. R.

Civ. P. 24(a)(2) (intervention as of right).  Sterling likewise has "a claim or defense that shares with the main action a common question of law or fact."  Fed. R. Civ. P. 24(b) (permissive intervention).

As adjudged by the Florida Court in the Florida Judgment and stated in the UCC Filings, Sterling (1) owns title to about 350,000 pounds of gold ore concentrate ("**Concentrate**") and (2) has a first priority UCC perfected security interest in the Concentrate and in a collection of rare gemstones of considerable but indeterminate value, known as the Ophir Collection ("**Collection**"), as well as other personal property owned by defendants Brett M. Regal ("**Regal**"), Migration Partners LLC ("**Migration**") and Trade Base Sales, Inc. ("**TBS**," and together with Regal and Migration, collectively, the "**Regal Parties**").  Because the Concentrate and Collection are the primary focus of this Motion, we refer to them together as the "**Collateral**."

The Florida Judgment, entered against the Regal Parties on May 6, 2019, (A) awards Sterling $9.75 million, **plus** interest and Sterling's collection/attorneys' fees, (B) recognizes Sterling's ownership of the Concentrate and its first priority UCC perfected interest in the Collateral, (C) forbids the Regal Parties from transferring ownership and control of the Collateral, (D) allows  the Regal Parties to monetize the Collection only in a transaction that satisfies the Florida Judgment and (E) enforces the parties agreement to the Florida Court's entry of a Consent Judgment embodying the terms of the parties' underlying settlement agreement. *See* Compl, Ex. 1.

The Receivership Order contravenes the Florida Judgment by, among other things, (A) directing the Receiver to take possession and control over the Collateral, including the Concentrate **owned by Sterling** and (B) directing the Receiver to sell the Collection (and, if needed, the Concentrate and the remainder of the Regal Parties' property) to satisfy a $17.5 million debt allegedly owed by the Regal Parties

*NOTICE OF MOTION AND MOTION TO INTERVENE*

1  to OTEC – all without mention of the Florida Judgment and UCC Filings.  Nearly

2  all of the powers vested in, and the directives given to, the Receiver pursuant to the

3  Receivership Order contravenes the Florida Judgment and UCC Filings.

4      The Order of Sale likewise contravenes the Florida Judgment by, among other

5  things, directing a sale of the Collection (which can only be encumbered to monetize

6  the Collection in order to pay the Florida Judgment) and (even if a sale were

7  authorized) directing the occurrence of sale without requiring that the Florida

8  Judgment be **fully satisfied** before the disposition of any other sale proceeds.  While

9  the Order of Sale provides that Sterling first be paid the principal amount of its

10  $9.75 million Florida Judgment, it does not require that Sterling be paid the

11  corresponding interest and the collection/attorneys' fees due pursuant to the Florida

12  Judgment.  Instead, the Successor Receiver, Blake Alsbrook, Esq., has told Sterling

13  that if the sale is consummated, Sterling must ask this Court for interest and

14  collection/attorneys' fees to be paid from those sale proceeds that remain after the

15  payment of $17.5 million to OTEC and payment of the Successor Receiver's fees.

16  That is not what the Florida Judgment requires.

17      The amended purchase and sale agreement ("**Amended PSA**") approved by

18  the Order of Sale is so flawed as to be illusory.  The Amended PSA reflects an

19  agreement by an unknown and dubious South African company to pay $220 million

20  for the Collection, to be sold to the Buyer's designee.  Yet, it provides no timetable

21  for critical steps needed to complete the transfer of the "sake keeping receipt"

22  ("**SKR**"), currently held in Orange County by Global Trust Depository ("**Global**"),

23  which evidences the ownership of the Collection and which triggers the requirement

24  for the Buyer to fund the $220 million purchase price.  The Amended PSA also

25  requires that the Successor Receiver only receive $30 million, not the full purchase

26  price – the remainder of which is to be paid in escrow to Global, who is not a party

27  to this action or a Receiver appointed by this Court.

28

Sterling and this Court should not be in this position.  Sterling notified the Receiver, the late David Pasternack, Esq., about its rights in August 2019, as soon as Sterling (who received no notice from the parties) had learned about the issuance of the Receivership Order.  In follow up conversations between Mr. Pasternack and Sterling, the parties' respective counsel did not challenge Sterling's superior property rights, including its ownership of the Concentrate and its first priority UCC perfected interest in the Collateral.  However, the Successor Receiver has taken no steps to apprise this Court that Sterling owns the Concentrate and to instruct I. Schumann & Co. ("**Schumann**"), who holds the Concentrate in Ohio, that Sterling owns title to the same.  And, as noted above, the Order does not fully protect Sterling's rights under the Florida Judgment and UCC Filings.

## II.     STATEMENT OF FACTS

The facts are drawn from the Compl., the truth of which has been verified in the accompany Declaration of Jeff Hackman ("**Hackman**"), Sterling's President, dated February 10, 2020 ("**Hackman Decl.**") and in the Exhibits to the Compl.

### A. Sterling's Early Dealings with the Regal Parties and OTEC's Counsel, Barks

Sterling's involvement with the Regal Parties, and its introduction to OTEC (with whom it has no business dealings) dates back to the summer and fall of 2017. *See generally* Compl. ¶¶ 29-31.  Separately, each of Sterling and OTEC had failed business dealings with the Regal Parties, and their paths crossed in the course of efforts by Sterling and OTEC to diligence the Regal Parties, identify assets and collect on their debts.  Compl. ¶ 30. Each of the dealings began with a failed agreement by Regal that one of his companies would invest in the business of Sterling or OTEC, respectively. OTEC was first to file suit, but only Sterling had obtained and perfected a UCC security interest in the Collateral.  *Id*.

On May 16, 2017, OTEC sued the Regal Parties and two other potential

*NOTICE OF MOTION AND MOTION TO INTERVENE*

investors – Robert Coe ("**Coe**") and David Large ("**Large**") in the United States District Court for the Western District of Tennessee (Case Number:  2:17-CV-0234-SHL-CGC) for alleged fraud and breach of an agreement to invest $42 million in OTEC's business (the "**First Tenn. Action**").  Compl. ¶ 31.

In June 2017, Regal or one of his affiliated companies entered into an agreement to fund an offshore Alaskan gold mining business, Phoenix Mining Offshore, Inc. ("**Phoenix**").  Regal breached that agreement, too.  Compl. ¶ 32.

In August 2017, Migration entered into an agreement with a Sterling affiliate to provide $5 million in funding for the affiliate's core business (litigation funding).  By September 8, 2019, Migration had defaulted on its funding obligation, leading Regal to advise Hackman that one of his affiliated companies owned the Ophir Collection and to propose a consulting agreement by which Sterling could be paid by assisting in efforts to monetize the Collection.  Compl. ¶ 33.

OTEC was represented in its dealings with the Regal Parties by attorney Daniel Barks ("**Barks**"), who has also appeared in this action.  In conducting diligence on Regal and his assets, Barks reached out to Hackman in November 2017.  Compl. ¶ 34.  Over about the next two years, they communicated from time to time about Regal's financial woes.  *Id*.  There can be no question that Barks routinely monitored public filings regarding Regal and that he learned, through Sterling's UCC Filings and entry of the Florida Judgment (if not earlier), about Sterling's ownership of the Concentrate and first priority UCC perfected security interest in the Collateral and the Regal Parties' other personal property.  *See* Compl. ¶ 35.

**B. Sterling Purchases the Concentrate and Obtains Its Security Interest in the Collateral**

**1.  The Ophir Collection Consulting Agreement**

In January 2018, Sterling and Regal struck the consulting deal that Regal had

*NOTICE OF MOTION AND MOTION TO INTERVENE*

proposed as a means to compensate Sterling for Migration's breach of the agreement to invest in a Sterling affiliate. Compl. ¶ 36. On January 15, 2018, a Sterling affiliate, Regal and TBS executed the Ophir Collection Consulting Agreement ("**Consulting Agreement**"), by which TBS and Regal retained the Sterling affiliate as its **exclusive** consultant to monetize the Collection in exchange for an initial flat consulting fee of $7.6 million, due on closing of an initial transaction, plus agreed upon percentage commissions on the value of any subsequent transactions. *Id*.

On May 7, 2018, Sterling secured an SKR enabling TBS to monetize the Collection in a financing and, five days later, Regal wrongfully terminated the Consulting Agreement.  Compl. ¶ 37.  As a result, the Regal Parties owed Sterling $7.6 million in liquidated damages.  Compl. ¶ 39.

### 2.   The Concentrate Sale Agreement and Secured Promissory Note

Separately, on April 6, 2018, Sterling and the Regal Parties executed a Letter Agreement by which Sterling sold its precious metals contained in the Concentrate to the Regal Parties for $7.6 million, payable by the Regal Parties' execution of a Secured Promissory Note ("**Note**") in Sterling's favor in the amount of the sale price, i.e., $7.6 million ("**Sale Agreement**"). Compl. ¶ 40. The Regal Parties, however, defaulted by failing to pay the Note when due on June 1, 2018. As a result, in accordance with the Bill of Sale, title to the Concentrate reverted to Sterling. Further, the collateral securing the Note included the Concentrate, the Collection and all of the Regal Parties' personal property (including financial accounts and receivables).  Comp. ¶¶ 40-45.

### 3.   The UCC Filings

On May 16, 2018, Hackman filed on behalf of Sterling Financial with the Ohio Secretary of State a UCC Financing Statement, perfecting the following interest granted Sterling pursuant to the Note:

> **[A] continuing first priority security interest and lien in and to all of the following, wherever located …**:  (i) **all personal property of**

---

6

Case No. 2:19-cv-05299-VAP-JPR

*NOTICE OF MOTION AND MOTION TO INTERVENE*

**every kind and nature** … (iv) the precious metals … contained in … [the **Concentrate] owned by the Secured Party** and currently in the possession of [Schumann], and the … **Ophir Collection** owned by the Debtor and currently on deposit … with [Global] as evidenced by [SKR] Number OPH/5718/COLL-1.8B, dated May 7, 2018.

Compl. ¶ 44 and Ex. 4.   On June 28, 2018, Sterling filed an identical UCC Financing Statement with the Secretary of the State of California. *Id.* ¶ 45 and Ex. 5.

### C. OTEC Obtains the "Agreed Judgment" in Tennessee, but With no Security Interest

Meanwhile, in March and April 2018, OTEC, Regal and the other defendants settled the First Tenn. Action, filing a series of settlement notices.  Compl. ¶ 46. Ultimately, on May 2, 2018 the parties filed a Second Joint Motion disclosing a settlement by which the Regal Parties agreed to pay OTEC $2.975 million by June 28, 2018 – just weeks after the Regal Parties' June 1, 2018 deadline to pay Sterling the $7.6 million purchase price for the Concentrate in accordance with the Note. Compl. ¶ 47.  They further agreed that, if they did not meet the June 28, 2018 deadline, they would pay OTEC a total of $8 million in liquidated damages.  *Id.*

On July 3, 2018, Sterling sued the Regal Parties in the Circuit Court of the Fifteenth Judicial Circuit in and for Palm Beach County, Florida (Case No. 2018-CA-008427-MB-AA) seeking damages of about $15 million for breaches of the Consulting Agreement, Letter Agreement and Note ("**Florida Action**").  Compl. ¶ 49.

Three days later, on July 6, 2018, OTEC filed a lawsuit in the United States District Court for the Western District of Tennessee, Case No.  2:18-CV-02457-SHL-CGC ("**Second Tenn. Action**") against Robert Coe ("**Coe**"), David Large ("**Large**") and the Regal Parties seeking $8 million in liquidated damages arising from their alleged breach of the First Tenn. Action.  Compl. ¶ 51.

On August 8, 2018, the federal court in the Second Tenn. Action issued an Agreed Judgment in favor of OTEC, in the amount of $8 million. Compl. ¶ 52. Yet,

*NOTICE OF MOTION AND MOTION TO INTERVENE*

OTEC was in a bind because Sterling owned the Concentrate, had a first priority UCC perfected interest in the Collateral and OTEC had no security interest in any of the Regal Parties' property. *Id*. and Ex. 6.

Thereafter, in September 2018, Barks tried to convince Sterling to collaborate in persuading the Regal Parties to monetize the Collection in order to pay debts they owed to Sterling (who had a perfected security interest) and OTEC (who did not). Sterling had no interest in OTEC's proposal. Compl. ¶ 54.  Barks then threatened that absent Sterling's cooperation in a joint collection effort against the Regal Parties, OTEC would ultimately do what it has now done:  seek to levy on the Collection in California, forcing Sterling to appear here in order to protect its superior property rights.  Hackman Decl. ¶ 7.

**D. The Consent Final Judgment**

The following spring, on April 29, 2019, Sterling and the Regal Parties resolved the Florida Action by entering into a Settlement Agreement in the amount $9.75 million.  Compl. ¶ 59.  On May 6, 2019, the Florida state court, on consent of the parties, entered the Florida Judgment approving and incorporating the term of the Settlement Agreement.  Compl. ¶60 and Ex. 1.  The Florida Judgment states that the Judgment Amount of $9.75 million "shall bear interest at the statutory rate commencing on September 3, 2018," and the Settlement Agreement grants Sterling the right to recover its collection/attorneys' fees. Ex. 1.

The Consent Judgment incorporates and enforces the Settlement Agreement.  Among other provisions contained in the Settlement Agreement:

- The Regal Parties acknowledged that Sterling is a secured creditor under the UCC having a "continuing first priority security interest in and to …(i) all personal property of Defendants of every kind and nature …(iv) the **Concentrate owned by [Sterling]** and currently in the possession of [Schumman] and (v) **the … Collection**, currently on deposit in a vault space

contracted with Global." Compl. ¶62 and Ex. 1 at ¶ 5(a)(i)(iv) and(v)
(Emphasis added).

- The parties agreed that "[n]either [Sterling] nor [the Regal Parties] shall,
  directly or indirectly, be permitted to move or relocate the Ophir Collection
  and Ore Concentrate from Global or Schumann's respective possession." *Id.*
  ¶ 5(b)(ii) (emphasis added).

- The Regal Parties agreed to execute notarized Irrevocable Letters of
  Instruction to Global and Schumann to verify their possession of the
  Collection and Concentrate, respectively.

- The Regal Parties warranted and represented that until the full payment of the
  Judgment Amount, they "shall not permit **entry or filing** of any pledge, lien**,
  judgment**, charge, **encumbrance**, hypothecation, option, right of first refusal,
  right of first offer, **agreement,** security interest, or debt against the Ophir
  Collection and Ore Concentrate, unless it is for financing or monetizing the
  assets as referenced in Paragraph 5(d) above." *Id.* ¶ 7(b).

Paragraph 5(d) stated that Sterling would not "interfere with or frustrate" the Regal
Parties efforts to monetize the Collateral "**contemporaneous with** the satisfaction of
the [Florida] Judgment. **However, Defendants must use their best efforts to
obtain financing or monetize the assets in order to pay the Judgment prior to
September 3, 2019**, and a condition precedent to the closing of any financing shall
be the payment of the Judgment Amount from those proceeds." *Id.* ¶ 5(d) (emphasis
added)

Sterling filed the Consent Final Judgment with the Superior Court of
California for the County of Orange, Case No. 30-2019-01074652-CU-EN-CJC on
June 4, 2019. Compl. ¶ 68. It filed a Writ of Execution on September 16, 2019,
after the "best efforts" period had expired. By then, this Court had entered the
Receivership Order. *Id*. and Ex. 8.

**E. The Receivership Order**

On May 28, 2019, just three weeks after the May 6, 2019 entry of the Florida Judgment, OTEC and the Regal Parties purportedly settled for $17,500,000 a "*prospective* fraud in the inducement lawsuit" that OTEC had threatened against the Regal Parties, reportedly based on nondisclosure about the Regal Parties' assets ("**Prospective Fraud Settlement**").[1]  Compl. ¶ 69. Contrary to the terms of the Florida Judgment, the parties agreed in the Prospective Fraud Settlement to seek the appointment of a Receiver and to cooperate in the sale of the Collection for at least $120 million and, potentially, of the Concentrate owned by Sterling and other personal property owned by the Regal Parties.  Compl. ¶¶ 69-74.

On July 2, 2019, the parties filed the Receiver Application confirming their "aware[ness] of the purported Florida judgment" but not disclosing its terms and submitted a proposed form of Order setting forth provisions that contravene the Florida Judgment and violate the rights granted Sterling by the UCC Filings. Compl. ¶ 70.

Without mention of the Florida Judgment, the Receivership Order includes the following provisions aimed at satisfying the Agreed Judgment and the Prospective Fraud Settlement.  It:

- appoints Mr. Pasternak as a Receiver "to carry out a levy on Regal Debtor's property;"
- directs him to take sole custody, possession and control of and sell the Collection and [the Concentrate], and refers to the Concentrate as property "**owned by the Regal Debtors**";
- divests the Regal Parties of and grants the Receiver exclusive control over the Collection and any other property needed to satisfy and execute on the Judgment and Settlement Agreement;

---

[1] Sterling has doubts about the validity of the purported fraud claim and of the settlement.

- grants the Receiver "authority to assign, sell and transfer the Debtor Property"; and

- directs that the "proceeds of any sales shall be used **to satisfy the [Agreed] Judgment** and [Prospective Fraud] Settlement, less the receivership's reasonable costs and fees."

Compl. 71, Ex. 2 at ¶¶ 2-8 (emphasis added). *See also id.* ¶ 9 (directing the Receiver to "pay any funds generated from Debtor Property to OTEC in satisfaction of the Judgment and Settlement Agreement, and, to the extent that there are funds available, pay any remaining funds to Regal Debtors).

**F. Sterling Notifies the Receiver of its Property Rights in the Collateral**

In a telephone call on August 20, 2019 and by letter dated August 21, 2019, Sterling's predecessor California counsel, Bradley Dugan, Esq., advised Mr. Pasternack that Sterling had just learned of the Joint Receivership Application and Receivership Order, and discussed the existence of the Florida Judgment and Sterling's interest in the Collateral.  Compl. ¶76.  The next day, August 22, 2019, Mr. Pasternak held a telephone call with Dugan, Evan Frederick, Esq. ("**Frederick**") (a Florida attorney who had represented Sterling in obtaining the Florida Judgment), Stuart Fraenkel, Esq. ("**Fraenkel**") and Barks (OTEC's counsel in this action).  Compl. ¶ 77.  During that call, counsel for Sterling reiterated Sterling's legal and factual positions as outlined in the August 21, 2019 letter, and no one challenged those positions.  Rather, counsel for Ocean Thermal and the Receiver reiterated that it was their goal for every party to get paid what they were owed pursuant to their respective judgments.  *Id.*

On about October 4, 2019, after Sterling had filed a writ of execution in California, Hackman and Frederick spoke by telephone with Mr. Pasternack and his paralegal, Ellen Phillips ("**Phillips**").  Compl. ¶ 78.  During the October 4 call, Hackman advised Mr. Pasternack about the September 3, 2019 expiry of the Regal

*NOTICE OF MOTION AND MOTION TO INTERVENE*

Parties' "exclusive" period to seek to monetize the Collection and expressed
concern over the Regal Parties' ability in any event to locate a legitimate buyer for
the Collection.  *Id*.  Mr. Pasternack disclosed that, while the Regal Parties had been
less than cooperative in providing information necessary to achieve a sale (e.g.,
appraisal information), they were nonetheless seeking a buyer of the Collection.
Compl. ¶ 79.  Mr. Pasternack reiterated his prior assurance to Hackman that
Sterling's rights would be fully protected in the event of any sale, and he assured
Hackman and Frederick that the Concentrate remained in Schumann's possession.
*Id*.  At his direction, following the call, Phillips sent Frederick an email attaching
Schumann's invoice for its storage of the Concentrate, together with a photograph of
the material in storage.  *Id*.

Mr. Pasternack died on November 21, 2019, a fact that Sterling learned only
after it observed on PACER this Court's December 3, 2019 Order appointing
Alsbrook as Successor Receiver. Compl. ¶ 80.

**G. The Order of Sale**

On December 30, 2019, the Successor Receiver filed a Stipulation to approve
a purchase and sale agreement ("**PSA**") dated December 24, 2019 by which a South
African Registered Company ("**Buyer**") agreed to purchase the Collection from
TBS for $220,000,000.00.  Compl. ¶ 82.  This transaction has yet to close.
Although the effective date of the PSA was December 20, 2019, TBS did not
execute the PSA until December 24, 2019 and neither the Successor Receiver nor
the Vault Manager/Escrow Agent executed the PSA at all.  Compl. ¶ 83.  Under the
terms of the PSA, the Buyer was to deposit the full purchase price with the Escrow
Agent by December 27, 2019.  *Id.*  That did not happen.

About two weeks later, on January 10, 2020, the Successor Receiver filed a
Revised Stipulation for Issuance of an Amended [Proposed] Order Approving Sale
of Receivership Estate Property pursuant to the [Amended] PSA.  Compl. ¶ 84, Dkt.

22. The Amended PSA does not change the purchase price of the Collection, but was purportedly filed due to the Buyer's "desire[] to take title to the Ophir Collection under the name of its assignee" and the Parties' desire to "clarify the manner" for the transfer of funds and possession of the Collection.  Compl. ¶85, Dkt. 22.

The payment and transfer mechanics are hardly an example of clarity.  The Amended PSA requires the Successor Receiver to direct Global to **issue** an SKR in the name of Buyer's designee "immediately upon his receipt" of the Court order approving the PSA – before the receipt of any funds.  Compl. ¶ 86, Dkt. 22. It contemplates that the Buyer would then receive a **copy** of the new SKR, presumably for use in facilitating the release of the purchase price.  *Id.*  However, it contains no deadlines by which the Successor Receiver must direct Global to deliver the new **original** SKR to the Successor Receiver and to deliver a **copy** thereof to the Buyer. Until that step occurs, there can be no release of the purchase price.  Ex. 3.

The Amended PSA grants the Buyer 72 hours from its receipt of a **copy** of the newly issued SKR to fund the full purchase price.  *Id.*, Dkt. 22.  But, this deadline is meaningless given the absence of any deadline by which Global must deliver the new SKR to the Successor Receiver and provide a **copy** thereof to the Buyer. Compl. ¶ 88.

This Court issued the Order of Sale on January 22, 2020. Ex. 3, Dkt. 23.

The next day, January 23, 2020, Sterling's counsel emailed the Successor Receiver and OTEC's counsel, asking a series of written questions directed at the ambiguity of the Amended PSA mechanics.  Compl. ¶ 90, Ex. 10.  Later that day, the Successor Receiver replied, apologizing that Sterling had asked "far too many questions for me to answer right now" based on his schedule and promising to give an update only when "the funds are paid in and paid per the terms of the order." Compl. ¶ 91, Ex. 10.

On January 30, 2020, Sterling's counsel sent the Successor Receiver another email request for an update, again copying OTEC's counsel.  Sterling's counsel stated, in part, "… at some point, I've got to advise my clients that the deal is not progressing and that it's time to intervene and assert their alternative rights to judgment enforcement.  Compl. ¶93, Ex. 11.  So, if there is genuine reason to believe the deal will be closed, we need to know that." *Id*.  The Successor Receiver replied, "Sorry no time for a call.  Deal is not done yet.  As I have repeatedly informed you, I will reach out when we have funds.  If you feel the need to bring a motion before Judge Phillips that's fine - just give me notice." *Id.*

## III.   THE MOTION TO INTERVENE SHOULD BE GRANTED

The Ninth Circuit liberally favors intervention.  Here, intervention is required because Sterling, a prior judgment creditor whose Florida Judgment is entitled to Full Faith and Credit (*see* U.S. Const. art. IV § 1), undeniably has a superior and substantial property right in the Collateral, its application is timely and its interests are not being adequately represented.

The Florida Judgment and UCC Filings establish Sterling's ownership of the Concentrate and its first priority security interest in the Collateral.  This application is timely because there has been no discovery, Sterling notified the Receiver of its rights in August 2019 and Sterling received his assurance that he would honor such rights. The Successor Receiver has not fully done so and, instead, has responded to Sterling's concerns by inviting this Motion.

Clearly, the parties are not adequately protecting Sterling's rights.  Having concealed those rights from this Court in their Joint Receiver Application, the parties have not corrected the record.  They have not advised this Court and Schumann that Sterling owns the Concentrate.  They have also sought and gained Court approval of an illusory – if not sham – Amended PSA that has not been funded, is hopelessly open-ended and does not require that the Florida Judgment be

*NOTICE OF MOTION AND MOTION TO INTERVENE*

paid **in full** before OTEC and the Successor Receiver are paid from any sale proceeds.

In short, intervention is needed to remedy a fraud on this Court, to restore integrity to this process and rights that have wrongfully been taken away from Sterling and, if necessary, to enable Sterling to assert its right to alternative means of judgment enforcement.

**A. Sterling Has A Right To Intervene**

Rule 24(a)(2) provides that a Court must permit intervention on timely application by anyone: (1) who "claims an interest relating to the property or transaction that is the subject of the action," and (2) whose interest may be "impair[ed] or impede[d]" by disposition of the action, "unless existing parties adequately represent that interest."  Fed. R. Civ. P. 24(a)(2).

The Ninth Circuit has recognized that a "liberal policy in favor of intervention serves both efficient resolution of issues and broadened access to the courts." *Forest Conservation Council v. United States Forest Serv.*, 66 F.3d 1489, 1496 n.8 (9th Cir. 1995) (internal citation omitted) (abrogated by further broadening of intervention under a specific statute in *Wilderness Soc'y v. United States Forest Serv.*, 630 F.3d 1173 (9th Cir. 2011)).  Accordingly, the requirements for intervention must be "broadly interpreted in favor of intervention" (*United States v. Alisal Water Corp.*, 370 F.3d 915, 919 (9th Cir. 2004)) and "guided primarily by practical and equitable considerations."  *Donnelly v. Glickman*, 159 F.3d 405, 409 (9th Cir. 1998).  Applying these principles, our courts grant intervention as of right under Fed. R. Civ. P. 24(a)(2) where: (1) the application is timely; (2) the movant has a significant protectable interest in the action; (3)  the disposition of the action may, as a practical matter, impair or impede the movant's ability to protect its interest; and (4) the existing parties may not adequately represent the applicant's

*NOTICE OF MOTION AND MOTION TO INTERVENE*

interest.  *See, e.g. Smith v Los Angeles Unified School Dist.*, 830 F.3d 843, 853 (9th Cir 2016).  Sterling has readily met these requirements.[2]

### 1.    Timeliness

In determining timeliness, the Ninth Circuit considers "three factors: (1) the stage of the proceeding at which an applicant seeks to intervene; (2) the prejudice to other parties; and (3) the reason for and length of the delay."  *Scotts Val. Band of Pomo Indians of Sugar Bowl Rancheria v United States*, 921 F.2d 924, 926 (9th Cir. 1990).  Each of these factors weighs heavily in favor of intervention.  Since there has not been sale of the Collection, this action is at a very early stage.  *See Idaho Farm Bureau Fed'n v. Babbitt,* 58 F.3d 1392, 1397 (9th Cir. 1995) (four months post filing is considered "a very early stage" of the litigation).  There has been no discovery.  The parties would not be unfairly prejudiced by Sterling's intervention in the action; rather, they would be required only to confront the nature of their rights in the Collection as compared with Sterling's rights.  Further, Sterling justifiably delayed in seeking to intervene, first, in order to honor the initial period of exclusivity it had given the Regal Parties' in trying to monetize the Collection and, second, in deference to the Receiver's assurances that Sterling's rights would be honored.  Sterling objected to the Successor Receiver when it learned that he was supporting a sale process that would not necessarily result in the payment to Sterling of all monies due under the Florida Judgment (including interest and collection/attorneys' fees), let alone prior to any payment to OTEC and the Successor Receiver.  Sterling's objections have been met by the Successor Receiver's apologetic insistence that he lacks the time to answer Sterling's concerns

---

[2] In the Ninth Circuit and in this District, a motion to intervene need not be accompanied by an actual pleading (e.g., a complaint), *see* Fed. R. Civ. P. 24(c), where, as here, the motion sufficiently sets forth the grounds for the application. *See, e.g., Beckman Indus., Inc. v Intl. Ins. Co.*, 966 F2d 470, 474-75 (9th Cir 1992) (discussing and citing case); *Thompson v Thompson*, 2-18-CV-04269 (RGK), 2018 WL 6133659, at *4 (CD Cal July 31, 2018) (relying on *Beckman Indus.*).

*NOTICE OF MOTION AND MOTION TO INTERVENE*

and by his invitation to intervene.[3]

Furthermore, the passage of time has made it painfully clear that the Regal Parties lack the capability to identify a legitimate buyer and to close on the Amended PSA or any other sale of the Collection.  Accordingly, the time has come for Sterling to intervene and seek to declare and enforce its property rights, including its title over the Concentrate and to foreclose on the Collection.

## 2.   Significantly Protectable Interest in the Subject Matter

Our courts have found a "significant protectable interest in an action" where the movant "(1) it asserts an interest that is protected under some law, and (2) there is a relationship between its legally protected interest and the plaintiff's claim." *Cal. ex rel. Lockyer v. United States*, 450 F.3d 436, 441 (9th Cir. 2006) (*quoting Donnelly*, 159 F.3d at 409).  The Florida Judgment, which enjoys the Full Faith and Credit of our Constitution, recognizes both Sterling's ownership of the Concentrate and its first priority security interest in the Collateral (and in all of the Regal Parties' personal property).  U.S. Const. art. IV § 1; *see also Sapukotana v Van Straalen Farm Trucking*, 457 Fed.App'x 682, 683 (9th Cir. 2011).

The first priority security interest set forth in the UCC Filings is likewise enforceable by this Court.  *See In re Peregrine Entertainment, Ltd.*, 116 BR 194, 205 (CD Cal 1990) ("A lien creditor generally takes priority over unperfected security interests in estate property because, under Article Nine, "an unperfected security interest is subordinate to the rights of ... [a] person who becomes a lien creditor before the security interest is perfected." *Citing* UCC § 9301(1).

There is, moreover, a very substantial relationship between Sterling's

---

[3] Rather than including Sterling's right to be paid its interest and collection/attorneys' fees in the Order of Sale, the Successor Receiver has advised Sterling that it will have an opportunity to see these payments by filing an application to the Court in connection with the Successor Receiver's submission of its Final Report.  Compl. ¶ 92, Ex. 7. That is not what the Florida Judgment provides.

*NOTICE OF MOTION AND MOTION TO INTERVENE*

property rights in the Collateral and this action because the purpose of this action is to pay OTEC's alleged debt by forcing a sale of the very Collateral in which Sterling has property rights. *California Trout, Inc. v United States Bur. of Reclamation*, 115 F Supp.3d 1102, 1119 (CD Cal. 2015) (finding sufficient protectable interest where moving party were contractually entitled to interests in shares of the project in dispute).

### 3. Sterling's Ability to Protect Its Interest May be Impaired

The significant relationship between the subject matter of this action and Sterling's property rights satisfies the requirement that, absent intervention, the parties may impair Sterling's ability to protect its interest. *Citizens for Balanced Use v. Montana Wilderness Association*, 647 F.3d 893, 898 (9th Cir. 2011) (citation omitted) (observing that once an intervenor demonstrates an interest in the action, a court should have "little difficulty concluding that the disposition of th[e] case may, as a practical matter, affect" the intervenor.). This risk has been made evident by the parties' concealing the identity and terms of the Florida Judgment from this Court and their submission of a Receivership Order that, through no fault of the Court, trammels upon Sterling's adjudicated and UCC protected property rights. If more were needed, the risk has been reinforced by the parties' failure to correct the record, their failure to take any steps to instruct Schumann to hold the Concentrate on behalf of Sterling as it rightful owner, and their apparent insistence that the Order of Sale not **require** that Sterling be paid from any sale proceeds all of the monies due under the Florida Judgment, including interest and collection/attorneys' fees.

The Successor Receiver, moreover, should not and cannot be engaged in an endless effort to sell the Collection. At some point (and Sterling believes the point has arrived), the parties and the Court must face the reality that the Regal Parties lack the contacts and sophistication necessary to present this Court with a legitimate buyer and that a sale of such an unusual set of assets is challenging because there is

no public market for the sale.  The Regal Parties' creditors are entitled to consider and invoke other judgment enforcement measures and Sterling's interest will likely be impaired unless it is permitted to intervene and advocate on its own behalf.

### 4.      The Parties do not Adequately Protect Sterling's Interest

The burden for showing that Sterling's interests are not being adequately protected in this action "should be treated as minimal." *Trbovich v. United Mine Workers of Am.,* 404 U.S. 528, 538 n. 10 (1972).  Sterling need only that "show[] that representation of [its] interest 'may be' inadequate." *Id. See generally* 6 Edward J. Brunet, *Moore's Federal Practice* § 24.03[4][a] (3d ed. 1997) ("A proposed intervenor "should be treated as the best judge of whether the existing parties adequately represent . . . [its] interests, and . . . any doubt regarding adequacy of representation should be resolved in [its] favor.").

Here, the parties concealed from this Court a sister state court Judgment that prevented them from seeking the very relief they applied for and were granted in the Joint Receivership Application.  The parties have conclusively shown their unwillingness to adequately protect Sterling's interest.  The very point of intervention is the recognition that Sterling is entitled to advocate for itself, rather than relying on the parties – whose interests differ – to do so.

### B. Sterling Should Be Granted Permission To Intervene

Rule 24(b)(3) of the Federal Rules of Civil Procedure provides that that "[o]n timely motion, the court may permit anyone to intervene who . . . has a claim or defense that shares with the main action a common question of law or fact." In making this determination a court must also consider "whether the intervention will unduly delay or prejudice the adjudication of the original parties' rights."  Fed. Civ. R. P. 24(b)(3); *see S.E.C. v Credit Bancorp, Ltd.,* 194 F.R.D. 457, 468 (S.D.N.Y. 2000) (granting intervention under Rule 24(b) where movants' interests were not adequately represented by a receiver); *cf. CEP Emery Tech Inv'rs LLC v JPMorgan*

*NOTICE OF MOTION AND MOTION TO INTERVENE*

*Chase Bank, N.A.*, 09-04409 (SBA), 2010 WL 1460263, at *5 (N.D. Cal. 2010). Here, the same considerations that compel intervention as of right also warrant permissive intervention. Sterling has a claim to preserve its property rights in and to collateral that is the subject matter of the action and in the constructive possession of the Successor Receiver. Lastly, intervention will not unduly delay or prejudice this Court's adjudication of the parties' respective property rights in the absence of a satisfactory sale of the Ophir Collection.

## IV.   CONCLUSION

For all of the foregoing reasons, Sterling's motion to intervene should be granted.

DATED:  February 10, 2020          THEODORA ORINGHER PC


                                   By:/s/ Bradley Dugan
                                      Bradley Dugan

*NOTICE OF MOTION AND MOTION TO INTERVENE*